❏ Original        ❏



CLERK'S OFFICE
A TRUE COPY
Oct 08, 2025
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) |
| the premises and detached garage located at | ) |
| 6603 23rd Avenue, Kenosha, Wisconsin 53143, | ) |
| and vehicle, further described in Attachment A | ) |

Case No. **25-M-521 (SCD)**

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:        Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ Eastern _____ District of _____ Wisconsin _____
*(identify the person or describe the property to be searched and give its location)*:

    See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

    See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before _____ 10-22-25 _____ *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.  ❏ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Hon. Stephen C. Dries _____ .
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❏ for _____ days *(not to exceed 30)*  ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____ 10-8-25. 11:20 am _____

*Judge's signature*

City and state: _____ Milwaukee, Wisconsin _____       Hon. Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

## Certification

    I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

Property to be Searched

      The property to be searched is the premises and detached garage located at **6603 23rd Avenue, Kenosha, Wisconsin 53143** (the "SUBJECT RESIDENCE"). The premises is a second floor unit of a white two-story house with a black roof on the southeast corner of 23rd Avenue and 66th Street. The numbers "6603" are displayed vertically on the front porch pillar. An entrance to the second floor unit is located on the east side of the structure, and can be accessed from the driveway on 66th Street. The SUBJECT RESIDENCE further has a detached garage accessible from the same driveway.

      Additionally, the property to be searched includes a gray 2019 Honda Civic bearing Illinois license plate CF78202.



## ATTACHMENT B

Property to be seized by the Government

1. The items, information, and data to be seized from the locations described in Attachment A are fruits, evidence, contraband, and/or instrumentalities, in whatever form and however stored, relating to violations of 18 U.S.C. § 115(a)(1)(B), as described in the search warrant affidavit, including, but not limited to:

   a. Firearms, ammunition, magazines, and/or tactical gear and body armor (armored plates and/or armored plate carriers) appearing to be in STANTON's possession, custody, or control;

   b. Any and all notes, documents, records, or correspondence, in any format and medium (including but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and handwritten notes) pertaining to the subject offenses;

   c. Evidence indicative of preparation in furtherance of those offenses;

   d. Evidence of motive, intent, or knowledge of those offenses;

   e. Digital devices or storage mediums used as means to commit the violations describe above, to include but not be limited to, cellular telephones, any computers or tablets located on the premises to be searched, and any digital device or storage media containing records relating to the subject offenses;

   f. For any storage medium whose seizure is otherwise authorized by this warrant, and any storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "computer"):

      i. evidence of who used, owned, or controlled the computer at the time the things described in this warrant were created, edited, or deleted, such as

logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

ii. evidence of software that would allow others to control the computer, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the lack of such malicious software;

iv. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

v. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

vi. evidence of the attachment to the computer of other storage devices or similar containers for electronic evidence;

vii. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer;

viii. evidence of the times the computer was used;

ix. passwords, encryption keys, and other access devices that may be necessary to access the computer;

x. documentation and manuals that may be necessary to access the computer or to conduct a forensic examination of the computer;

xi. records of or information about Internet Protocol addresses used by the computer;

xii. records of or information about the computer's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

xiii. contextual information necessary to understand the evidence described in this attachment.



CLERK'S OFFICE
A TRUE COPY
Oct 08, 2025
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

the premises and detached garage located at 6603 23rd Avenue, Kenosha, Wisconsin 53143, and vehicle further described in Attachment A

)
)
)
)
)
)

Case No. **25-M-521 (SCD)**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Eastern _____ District of _____ Wisconsin _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 115(a)(1)(B) | Threats to Assault, Kidnap, or Murder a United States Official |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____ )* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Joshua Eagen, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date: 10-8-25

_____
*Judge's signature*

City and state: Milwaukee, Wisconsin

Hon. Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Joshua Eagen, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since 2020. I am assigned to the Joint Terrorism Task Force ("JTTF") and am based out of the Milwaukee Field Office. I am involved in investigations of persons suspected of violations of Federal law in the State of Wisconsin and throughout the United States. I have gained experience conducting investigations through formal training and consultation with local, state, and federal law enforcement agencies as well as from the law enforcement investigations themselves. I have assisted in multiple criminal investigations and participated in numerous search and arrest warrants related to such investigations.

2.      As such, I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2710(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

3.      The facts in this affidavit come from my personal observations, my training and experience, and from information obtained from other agents, witnesses, and law enforcement officers. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.　　Based on the facts as set forth in this affidavit, there is probable cause to believe that Andrew Warren STANTON violated Title 18, United States Code, Section 115(a)(1)(B) by threatening to assault or murder a United States official.

**JURISIDCTION**

5.　　This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A), & (C)(1)(A). Specifically, the Court is "a district court of the United States… that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711 (3)(A)(i).

**PROBABLE CAUSE**

1.　　On August 26, 2025, Southeast Wisconsin Threat Analysis Center (STAC) received a tip from the Wisconsin Statewide Intelligence Center (WSIC) Threat Analysis Unit that an individual appearing to be Andrew STANTON, date of birth (DOB) July 14, 1987, was making threatening statements using a TikTok account with username @halfdayandy1.1. The main concern expressed in the tip was the user's attempt at soliciting Israeli personal information. The text was recorded as "Do you have the known whereabouts of [Israel flag] IDF members in the IL/WI area? Feel free to dm me. We need verification that they are IN or served." The account @halfdayandy1.1 was removed before all videos could be reviewed, but separate accounts - @halfdayandy1.2 and @halfdayandy1.3 – contained similar rhetoric.

2.　　On October 6, 2025, TikTok provided subscriber records which included email address a.stanton11@protonmail.com as associated with TikTok account @halfdayandy1.3 and coopoverwatch11@gmail.com as associated with TikTok user

@halfdayandy1.2. Comparison of STANTON's Driver's License photograph obtained

from the Wisconsin (WI) Department of Transportation (DOT) against the white male

featured in the posts in both the @halfdayandy1.2 and @halfdayandy1.3 TikTok

accounts leads your affiant to believe that STANTON is the user of both accounts.

3.      On October 6, 2025, T-Mobile provided records indicating that the

subscriber of telephone number 408-835-8596 was Andrew Stanton, DOB July 14, 1987,

at 6603 23rd Avenue, Kenosha, Wisconsin 53143, and had been since December 16,

2024.

4.       On or about August 29, 2025, a video was posted by @halfdayandy1.3 in

which STANTON stated, "We're not getting through to them [politicians] with using our

words. That's never gonna happen. You have to use bullets." In a separate video posted

on or about the same day, and which featured STANTON, text was superimposed on the

screen which read, "I imply the very TRUE statement that a violent state can only be

stopped with violence in return. / Also, I think we should be OFFING federal agents /

Also, I support "terrorism" by their standard. Anti-imperialist by mine."

5.      On September 5, 2025, federal law enforcement officers attempted to

conduct an interview with STANTON both in-person at 6603 23rd Avenue, Kenosha, WI

and telephonically at 408-835-8596 but were unable to reach him. Federal law

enforcement officers made similar attempts on September 9, 2025, but were again unable

to reach STANTON.

6.      On or about September 10, @halfdayandy1.3 posted a video in which

STANTON stated, "When there are mass shootings, they are successful. People die and

people are terrorized. You can apply that to other people. Federal agents." On or about the same day, @halfdayandy1.3 posted a video in which STANTON stated, "Long day for me, and I'm not necessarily out here to be eloquent. I just want to say one thing. Do more Charlie Kirks. Do a lot more Charlie Kirks."

7. On September 11, 2025, a federal law enforcement officer (VICTIM 1) made additional attempts to contact STANTON both in-person at 6603 23rd Avenue, Kenosha, WI and telephonically at 408-835-8596. After these were unsuccessful, VICTIM 1 texted the same number, "Hi Andrew, please call me when you have a chance." VICTIM 1 received the reply "Who is this?" VICTIM 1 subsequently identified himself as Joe, a supervisor with the United States Customs and Border Protection assigned with the FBI and indicated that he wished to speak to STANTON about posts he had been making. During the course of the conversation, STANTON made clear he had no interest in speaking with law enforcement. After VICTIM 1 received a message from STANTON stating, "Go fuck yourself", VICTIM 1 replied, "Copy. Thank you for your time."

8. STANTON continued to engage VICTIM 1 between approximately September 11, 2025 and September 12, 2025 with a series of messages and images, leading VICTIM 1 to block the number. Some of the messages from STANTON were transcribed below:

     a. "Please die. It will help future generations"

     b. "Kill yourself fed"

     c. "Hang yourself in your wife's closet so she discovers your corpse" / "Or maybe in one of your kids rooms" / "You'd be doing them a favor"

d. "Does that green uniform stain real bad?"

e. "Let's meet" / "I'm not big into calling the cops so I'll bring my own form of justice. You've knocked on my door before. You know my address[1]. Let me know when your [sic] on the way"

f. "Mr border patrol with the FBI?" / "I'd like to meet." / "So we can discuss my mental health"

g. "If you're actually a fed, which at this point I'm for sure doubting. I hope it's and [sic] "illegal" that drops you, bury you, and piss on your grave" / That would be some poetic justice wouldn't it?"

9.      STANTON also sent a meme comprised of an animated representation of Charlie Kirk with a bleeding neck wound. A caption accompanied the image which stated, "This should be a lesson on how To [sic] deal with fascists. You don't Debate [sic] them, you delete them."

10.      On or about September 11, 2025, STANTON, as TikTok user @halfdayandy1.3 posted a video which included portions of the text conversation between himself and VICTIM 1 as well as the following caption, "To the agents on my file: Like I told the last guy, "get fucked pig.""

11.      On or about October 4, 2025, TikTok user @halfdayandy1.2 posted a video in which a white male matching the physical appearance of STANTON stated, "What the fuck are we even talking about here? If ICE shows up to your neighborhood – I'm sorry, I'm just gonna say it. It's time to start fucking shooting at them. If they show

---

[1] This acknowledgement simultaneously supports the belief that (1) STANTON was the one using the phone, (2) STANTON was aware of law enforcement's previous attempts to contact him, and (3) that the phone in question is primarily located within the Eastern District of Wisconsin as stated above in paragraph 4.

up to your neighborhood, and I'm talking you, Border Patrol Officer Joe[2], it's time we start shooting at you."

12.     Between June 7, 2025 and September 11, 2025, posts to STANTON's TikTok accounts included shots of tactical gear including what appeared to be a long gun and multiple rifle magazines. An accompanying caption stated, "I move like a communist Not a democrat. I know this isn't common knowledge in Amerika [sic] but, I moved waaaaay left after I went to Iraq in the marine corps". Some of the captured stills were included below.



13.     In another post made on or around September 10, 2025, STANTON stated, "I will go homeless and live on the street so I can spend my $3,900 a month I get from VA disability to burn this regime to the ground". He adds "I will pay you to not pop rounds. To not pop rounds, I will pay you. If you don't want bullets, I won't get them for

---

[2] As described in Paragraph 12, VICTIM 1 had identified himself to STANTON only as Joe, a CBP supervisor with the FBI.

Case 2:25-mj-00521-SCD     Filed 10/08/25     Page 13 of 36     Document 1

you," while nodding his head up and down. A caption accompanying the video stated, "This is satire and it's Opposite Day and I don't ever say what I mean and this Statement literally, isn't literal" / "I'm pretty sure nothing matters anymore. Just say what you gotta say." Several TikTok users commented in response to STANTON's post. Some these were included below.

  a. "What are we waiting for"

  b. "I want one"

  c. "Is there a group that gathers fundes [sic] to acquire both the pea shooter and the peas?? Or is there a group arming trans and queer people? If so I need their servies [sic]. Sincere question because I have a sincere need"

  d. "Dm me I'm looking for work"

  e. "[thumbs up emojies] I will not pop rounds"

  14. The Department of Veterans Affairs Police conducted a name search for STANTON on October 7, 2025, and found that STANTON was entitled to Veterans Affairs (VA) Disability Compensation, and that he indeed received a VA monthly reward. Veterans Benefit Management System (VBMS) records also described STANTON as having the following identifiers:

  a. Telephone number: 408-835-8596

  b. Email address: A.STANTON11@PROTONMAIL.COM[3]

---

[3] As described in Paragraph 2, email address a.stanton11@protonmail.com was listed by TikTok as being associated with TikTok username @halfdayandy1.3.

c.   Home Address: 6603 23rd Avenue, Upper Unit, Kenosha, WI 53143

15.     Based on the foregoing, this affiant holds that it is reasonable to believe that STANTON has violated 18 U.S.C. § 115(a)(1)(B), Threats to Assault, Kidnap, or Murder a United States Official.

## 6603 23RD AVENUE, KENOSHA, WISCONSIN 53143

16.     On October 7, 2025, FBI observed STANTON leaving 6603 23rd Avenue, Kenosha, WI; specifically, he exited the light-colored door on the east side of the residence which had a light above it. STANTON made several trips back and forth between the residence and a gray 2019 Honda Civic bearing Illinois license plate CF78202 which was parked in the driveway. STANTON carried loads of laundry and a backpack, among other items, and loaded them into IL-CF78202. According to Veterans Affairs Police, Stanton drives a gray 2019 Honda Civic with Illinois license plate CF78202. According to the Wisconsin Department of Transportation (DOT), STANTON's address is 6603 23rd Avenue, Upper, Kenosha, WI 53143.

17.     Adjacent to the main structure, is a detached garage accessible from the driveway in which IL-CF78202 was parked. Based on my training and experience, occupants of a residence will often use garages for storage of various items which they don't require immediate or regular access to.

18.     As described in Paragraph 3, both Veterans Affairs Police and T-Mobile records indicated telephone number 408-835-8596 was used by STANTON, and that STANTON's address was 6603 23rd Avenue, Kenosha, Wisconsin 53143.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

19.     As described above and in Attachment B, this application seeks permission to search for records that might be found in the Residence and on or near STANTON's person, in whatever form they might be found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media, to include laptops and cellular telephones.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

20.     "Digital device," as used herein, includes the following three terms and their respective definitions:

a.  A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.  *See* 18 U.S.C. § 1030(e)(1).  Computers are physical units of equipment that perform information processing using a binary system to represent information.  Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

b.  "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices.  Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

c. "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

d. "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks. When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and

storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

e. A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

f. "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware

may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

g. "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

h. Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet. An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i. The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

j. "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber. By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

k. A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

l. "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

m. "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can. In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.

This is usually done with the use of an encryption key, which specifies how the message is to be encoded. Any unintended party that can see the ciphertext should not be able to determine anything about the original message. An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

n. "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems. It can appear in the form of code, scripts, active content, and other software. Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

21. *Probable Cause.* I submit that if a computer or storage medium (including a cellular telephone) is found in the Residence, the detached garage, the subject vehicles, and on or near STANTON's person, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e. In addition, in my training and experience, I know it is common for individuals to back up or preserve copies of digital media (such as photos and videos) across multiple devices to prevent loss. Indeed, some companies provide services that seamlessly sync data across devices, such as Apple devices and the Apple iCloud service. Thus, there is reason to believe that evidence of the offenses under investigation that originally resided on one digital device belonging to STANTON may also be saved to other digital devices belonging to him. Based on that, there

is also probable cause to believe that evidence related to these offenses may have been transferred to and stored on digital devices beyond the particular digital device STANTON possessed during the commission of the offenses. For example, computers or other storage media may contain evidence of the Subject Offenses or planning and preparation for STANTON's activities.

22. *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the premises because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the

sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, location information, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media

access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in

advance the records to be sought, computer evidence is not always data that can

be merely reviewed by a review team and passed along to investigators. Whether

data stored on a computer is evidence may depend on other information stored on

the computer and the application of knowledge about how a computer behaves.

Therefore, contextual information necessary to understand other evidence also

falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use,

who used it, and when, sometimes it is necessary to establish that a particular

thing is not present on a storage medium. For example, the presence or absence

of counter-forensic programs or anti-virus programs (and associated data) may be

relevant to establishing the user's intent.

23. *Necessity of seizing or copying entire computers or storage media.* In

most cases, a thorough search of the premises for information that might be stored on

storage media often requires the seizure of the physical storage media and later off-site

review consistent with the warrant. In lieu of removing storage media from the premises,

it is sometimes possible to make an image copy of storage media. Generally speaking,

imaging is the taking of a complete electronic picture of the computer's data, including

all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure

the accuracy and completeness of data recorded on the storage media, and to prevent the

loss of the data either from accidental or intentional destruction. This is true because of

the following:

a. The time required for an examination. As noted above, not all evidence takes the

form of documents and files that can be easily viewed on site. Analyzing

evidence of how a computer has been used, what it has been used for, and who

has used it requires considerable time, and taking that much time on premises

could be unreasonable. As explained above, because the warrant calls for forensic

electronic evidence, it is exceedingly likely that it will be necessary to thoroughly

examine storage media to obtain evidence. Storage media can store a large

volume of information. Reviewing that information for things described in the

warrant can take weeks or months, depending on the volume of data stored, and

would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways,

featuring a variety of different operating systems, application software, and

configurations. Therefore, searching them sometimes requires tools or knowledge

that might not be present on the search site. The vast array of computer hardware

and software available makes it difficult to know before a search what tools or

knowledge will be required to analyze the system and its data on the premises.

However, taking the storage media off-site and reviewing it in a controlled

environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be

stored in a variety of storage media formats that may require off-site reviewing

with specialized forensic tools.

24.     *Nature of examination.*  Based on the foregoing, and consistent with Rule

41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise

copying storage media that reasonably appear to contain some or all of the evidence

described in the warrant, and would authorize a later review of the media or information

consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a storage medium to human inspection in order to determine whether it is evidence described by the warrant.

## BIOMETRIC ACCESS TO DEVICE(S)

25.     This warrant permits law enforcement agents to obtain from the person of STANTON (but not any other individuals at the time of execution of the warrants) the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any Device(s) requiring such biometric access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that the aforementioned person(s)' physical biometric characteristics will unlock the Device(s). The grounds for this request are as follows:

   a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.  If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device.  The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.  If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face.  For example, this feature is available on certain Android devices and is called "Trusted Face."  During the Trusted Face registration process, the user holds the device in front of his or her face.  The device's front-facing camera then analyzes and records data based on the user's facial characteristics.  The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face.  Facial recognition features found on devices produced by other manufacturers (such as Apple's "Face ID") have different names but operate similarly to Trusted Face.

d.  If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises.  For example, on certain Microsoft devices, this feature is called "Windows Hello."  During the Windows Hello registration, a user registers his or her irises by holding the device in front

of his or her face.  The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises.  The device can then be unlocked if the infrared-sensitive camera detects the registered irises.  Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

e.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.  This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

f.  As discussed in this Affidavit, your Affiant has reason to believe that one or more digital devices, the Device(s), will be found during the search.  The passcode or password that would unlock the Device(s) subject to search under this warrant currently is not known to law enforcement.  Thus, law enforcement personnel may not otherwise be able to access the data contained within the Device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

g.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if

such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

h. Due to the foregoing, if law enforcement personnel encounter any Device(s) that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to obtain from the aforementioned person(s) the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any Device(s), including to (1) press or swipe the fingers (including thumbs) of the aforementioned person(s) to the fingerprint scanner of the Device(s) found at the Residence, and on or near STANTON's person; (2) hold such Device(s) found in front of the face of the aforementioned person(s) to activate the facial recognition feature; and/or (3) hold such Device(s) in front of the face of the aforementioned person(s) to activate the iris recognition feature,

for the purpose of attempting to unlock the Device(s) in order to search the contents as authorized by this warrant.

i.  The proposed warrant does not authorize law enforcement to require that the aforementioned person(s) state or otherwise provide the password, or identify specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the Device(s).  Nor does the proposed warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel the aforementioned person(s) to state or otherwise provide that information.  However, the voluntary disclosure of such information by the aforementioned person(s) would be permitted under the proposed warrant.  To avoid confusion on that point, if agents in executing the warrant ask any of the aforementioned person(s) for the password to any Device(s), or to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks any Device(s), the agents will not state or otherwise imply that the warrant requires the person to provide such information, and will make clear that providing any such information is voluntary and that the person is free to refuse the request.

## CONCLUSION

26.     Based on the forgoing, I submit that this affidavit supports probable cause to search the items in Attachment A and seize the items in Attachment B.

## ATTACHMENT A

Property to be Searched

The property to be searched is the premises and detached garage located at **6603 23rd Avenue, Kenosha, Wisconsin 53143** (the "SUBJECT RESIDENCE"). The premises is a second floor unit of a white two-story house with a black roof on the southeast corner of 23rd Avenue and 66th Street. The numbers "6603" are displayed vertically on the front porch pillar. An entrance to the second floor unit is located on the east side of the structure, and can be accessed from the driveway on 66th Street. The SUBJECT RESIDENCE further has a detached garage accessible from the same driveway.

Additionally, the property to be searched includes a gray 2019 Honda Civic bearing Illinois license plate CF78202.

 

## <u>ATTACHMENT B</u>

<u>Property to be seized by the Government</u>

1. The items, information, and data to be seized from the locations described in Attachment A are fruits, evidence, contraband, and/or instrumentalities, in whatever form and however stored, relating to violations of 18 U.S.C. § 115(a)(1)(B), as described in the search warrant affidavit, including, but not limited to:

   a. Firearms, ammunition, magazines, and/or tactical gear and body armor (armored plates and/or armored plate carriers) appearing to be in STANTON's possession, custody, or control;

   b. Any and all notes, documents, records, or correspondence, in any format and medium (including but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and handwritten notes) pertaining to the subject offenses;

   c. Evidence indicative of preparation in furtherance of those offenses;

   d. Evidence of motive, intent, or knowledge of those offenses;

   e. Digital devices or storage mediums used as means to commit the violations describe above, to include but not be limited to, cellular telephones, any computers or tablets located on the premises to be searched, and any digital device or storage media containing records relating to the subject offenses;

   f. For any storage medium whose seizure is otherwise authorized by this warrant, and any storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "computer"):

      i. evidence of who used, owned, or controlled the computer at the time the things described in this warrant were created, edited, or deleted, such as

logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

ii. evidence of software that would allow others to control the computer, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the lack of such malicious software;

iv. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

v. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

vi. evidence of the attachment to the computer of other storage devices or similar containers for electronic evidence;

vii. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer;

viii. evidence of the times the computer was used;

ix. passwords, encryption keys, and other access devices that may be necessary to access the computer;

x. documentation and manuals that may be necessary to access the computer or to conduct a forensic examination of the computer;

xi.   records of or information about Internet Protocol addresses used by the computer;

xii.   records of or information about the computer's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

xiii.   contextual information necessary to understand the evidence described in this attachment.